******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

WILLIAM RAVEIS REAL ESTATE, INC. *v.* PETER
ZAJACZKOWSKI ET AL.
(AC 37843)

Lavine, Sheldon and Flynn, Js.

*Argued November 17, 2016—officially released April 25, 2017*

(Appeal from Superior Court, judicial district of
Fairfield, Kamp, J.)

*Enrico Vaccaro*, with whom, on the brief, was *Emily A. Gianquinto*, for the appellants (defendants).

*Tracey Lane Russo*, for the appellee (plaintiff).

*Opinion*

LAVINE, J. The defendants, Peter Zajaczkowski and Iwona Zajaczkowski, appeal from the judgment of the trial court, rendered after a trial to the court, in favor the plaintiff, William Raveis Real Estate, Inc. On appeal, the defendants claim that the court (1) erred in concluding that they had breached the exclusive agreement they had with the plaintiff, (2) abused its discretion by awarding the plaintiff attorney's fees and costs in the absence of an evidentiary hearing, and (3) violated General Statutes § 42-150aa with respect to the award of attorney's fees. We affirm the judgment of the trial court.

In its memorandum of decision issued on February 26, 2015, the trial court made the following findings of fact. The plaintiff, a Connecticut corporation with its principal office located in Shelton, is a real estate brokerage firm that represents buyers and sellers. The plaintiff commenced the present litigation to obtain payment of a real estate commission it alleged it was owed in connection with the defendants' purchase of a home at 6 Blackhouse Road (Blackhouse property) in Trumbull.[1] The plaintiff alleged that it was due a commission pursuant to an agreement between the parties known as an "Exclusive Right to Represent Buyer Authorization" (agreement). The defendants denied that an enforceable agreement existed between them and the plaintiff and that they owed the plaintiff a commission. The defendants alleged three special defenses as to the plaintiff's cause of action[2] and a two count counterclaim.[3]

The defendants are husband and wife, who have two school aged children. Iwona Zajaczkowski, a native of Poland, had resided in Connecticut for approximately seventeen years by the time of trial. She had been employed by Connor Corporation, a marketing company. Peter Zajaczkowski was employed as an executive director of process engineering at Morgan Stanley Fund Services. He previously was employed by General Electric Corporation and Deloitte & Touche. He had earned a bachelor of science degree in business management and a master's degree in business administration and finance from the University of Connecticut.

Early in 2010, the defendants were living in an apartment and wanted to purchase a three or four bedroom house with a yard. Although they wanted to find a home in Trumbull to take advantage of its public schools, they were willing to look at homes in other Fairfield county towns. They had no time constraints, but ideally wished to purchase a home before the month of September so that their son could enter school at the beginning of the school year.

The court found that a friend of the defendants had referred them to Freda Takacs, a licensed real estate

agent who had been affiliated with the plaintiff for approximately fifteen years. Peter Zajaczkowski made the initial contact with Takacs and described to her the type of home the defendants wished to purchase and its preferred location. Thereafter, Takacs identified houses to show the defendants. In addition, she gave the defendants access to the plaintiff's listing book, a nonproprietary service that the plaintiff's agents offer to customers so that customers can perform their own Internet searches of homes available for purchase. Peter Zajaczkowski actively searched for homes that met the defendants' specifications by using the listing book and regularly contacting Takacs about properties that the defendants wished to view.

Prior to showing the defendants a particular house on March 29, 2010, Takacs presented them with the agreement. The agreement is a preprinted, three page form with the plaintiff's name appearing prominently at the top of each page. Before Takacs presented the agreement to the defendants, she entered certain information onto it, including the term of the agreement and the compensation to be paid to the plaintiff. The agreement was for a term of one year, from March 29, 2010 to March 29, 2011. The agreement provided, in part, that Takacs, as the buyer's agent, was to use diligent efforts to locate property that met the defendants' specifications and that she was to negotiate the terms and conditions of the purchase of any property the defendants wished to buy. The agreement also provided that if the defendants purchased a home during the term of the agreement, the plaintiff was to earn a commission equal to 3 percent of the sale or exchange price of the purchased property. In addition, the plaintiff was to earn an administrative fee of $195. The defendants signed and initialed each page of the agreement on March 29, 2010. They did not request that any of the terms of the agreement be changed. Takacs, as the plaintiff's authorized agent, signed the agreement on behalf of the plaintiff.

After the agreement was signed, Takacs showed the defendants a number of homes in Monroe, Trumbull, and Fairfield, including 77 Russ Road (Russ Road property) in Trumbull. The defendants submitted an offer to purchase the Russ Road property, but the transaction was not consummated because a bank appraisal failed to support the purchase price and mortgage financing contingencies. Although there was some evidence that the defendants' offer was higher than the fair market value of the property, Peter Zajaczkowski testified that he was not pressured by Takacs to submit an offer. The defendants, however, criticized Takacs' efforts to work with the bank's appraiser to ensure that the appraisal satisfied the mortgage lending requirements. Despite this criticism, the court found that Takacs acted with appropriate diligence during the negotiations regarding the defendants' attempt to purchase the Russ Road

property.

The court found that following their failed attempt to purchase the Russ Road property, the defendants' relationship with Takacs deteriorated. Peter Zajaczkowski felt that he could no longer work with her and by October 15, 2010, he wished to terminate the agreement. Takacs did not agree to rescind the agreement and reminded Peter Zajaczkowski of the defendants' obligations under the agreement. On November 5, 2010, Takacs sent an e-mail message to Peter Zajaczkowski stating: "[t]o be told that you no longer want to work with me after I worked so hard stung and made me feel unappreciated and I told you so. This is not cancellation of a contract and it is still in force. My frustration at being rejected does not in any way negate your responsibility to work with my company if you choose to buy without me or my company, we will be pursuing you for commission." The court found that Linda Myers, the plaintiff's sales manager, was the only individual within the company with authority to terminate an agreement. Myers never agreed to terminate the parties' agreement.

The court also found that despite Peter Zajaczkowski's claim that he terminated the agreement, he continued to use the listing book provided by the plaintiff to research available properties subsequent to October, 2010. On December 21, 2010, he contacted Takacs to ask her opinion about a piece of property in Trumbull. Although Peter Zajaczkowski testified that he contacted Takacs to ask her input "as a friend," Takacs testified that she reminded him of their mutual obligations under the agreement. Takacs wrote in an e-mail to Peter Zajaczkowski on December 21, 2010: "[p]lease also do know that you need to go through William Raveis for any house you want to purchase. This is the same as when you have your house on the market. The agency gets paid if you sell during a listing contract and gets paid if you buy during it as well."

On January 5, 2011, the defendants submitted a written offer to purchase the Blackhouse property through Chris Carey, a real estate agent not affiliated with the plaintiff. The defendants had a fully executed purchase and sale contract with the sellers of the Blackhouse property by January 21, 2011, and obtained title to the Blackhouse property on April 12, 2011. The defendants have not paid the plaintiff a commission with respect to their purchase of the Blackhouse property.

In resolving the plaintiff's breach of contract claim alleged in count one, the court found that the agreement is entitled, "Exclusive Right to Represent Buyer Authorization." The term of the agreement was from March 29, 2010 to March 29, 2011. The agreement identifies the buyers as the defendants and provides in relevant part: "You, Buyer(s) [the defendants] appoint Us [the plaintiff] as Your exclusive real estate Broker to repre-

sent You and assist You in locating and purchasing or exchang[ing] real property acceptable to You and generally described as residential real estate located within the State of Connecticut . . . . During the term of this Authorization You will work exclusively through Us in locating and purchasing or exchanging the Property." The agreement also states with respect to the defendant: "(A) You will tell Us about all past and current contacts with any real property or any other real estate agents and refer all leads or information about the Property to Us. (B) You will cooperate with Us and be reasonably available to examine real property."

The court found that the agreement also imposed certain duties on the plaintiff, to wit: "(A) We will use diligent efforts to find property within Your specifications. (B) We will negotiate on Your behalf for terms and conditions agreeable to You. (C) We will assist and act in Your interest regarding the location and purchase or exchange, as the case may be, of the Property."

As to the compensation due the plaintiff, the court found that section VI of the agreement states in part: "You agree to pay Us a fee of . . . 3 % of the sales or exchange price of the real property You purchase. This fee will be waived if We collect from the Seller or Listing Agency." Also, the agreement provides: "In addition to the above compensation and upon passing of title, You agree to pay [the plaintiff] an Administrative Fee of $195.00. This fee does not apply to purchases financed by government loans (VA, CHFA, FHA)."

On the basis of the evidence presented at trial, the court found that on November 21, 2010, while the agreement between the plaintiff and the defendants was in full force and effect, the defendants entered into an exclusive right to represent buyer agreement with Carey, a real estate broker with Carey & Guarrera. On January 5, 2011, the defendants submitted a written offer to purchase the Blackhouse property through Carey, who was not affiliated with the plaintiff. A fully executed contract to purchase the Blackhouse property was in effect by January 21, 2011, and the closing took place on April 12, 2011. The court credited Carey's testimony that at no time was he aware that the defendants previously had entered into "an exclusive right to represent buyer authorization" with the plaintiff.

The court also found that the defendants were not unsophisticated consumers. Peter Zaczkowski holds a bachelor of science degree in business management and a master's degree in business administration and finance. He was employed by large corporations, including Morgan Stanley Fund Services and Deloitte & Touche. Peter Zaczkowski was very engaged in the process of researching and locating potential homes to purchase. The court found that the defendants' claim that they were forced into signing the agreement and that they could not negotiate different terms was not

credible.

The court concluded, therefore, that the defendants' actions constituted a breach of the agreement that they had entered into with the plaintiff. As a consequence of the defendants' breach of the agreement, the court awarded the plaintiff damages of $12,300 pursuant to the agreement, which provides that the defendants agree to pay the plaintiff "3 [percent] of the sales or exchange price of the real property [they] purchase[d] . . . upon passing of title . . . ."[4]

The court, however, found in favor of the defendants on the plaintiff's counts of fraudulent misrepresentation and breach of the covenant of good faith and fair dealing.[5] With respect to the defendants' counterclaims, breach of contract and breach of the covenant of good faith and fair dealing, the court found that the defendants failed to meet their burden of proof.

On March 5, 2015, the defendants filed a motion for reargument and reconsideration (motion to reargue) of the judgment for the plaintiff on its breach of contract claim. The defendants argued that the plaintiff was not entitled to be paid 3 percent of the purchase price of the Blackhouse property because the transfer of title occurred after the term of the agreement. Moreover, the defendants argued that the contract into which they entered for the Blackhouse property was unenforceable as it was illusory. The plaintiff objected to the motion to reargue on the ground that the motion to reargue had failed to identify a case or principle of law that the court had overlooked. The court denied the motion to reargue on the ground that the defendants had failed to identify any new issue or principle of law or appellate authority that was not previously raised and considered by the court in its memorandum of decision.

The defendants appealed on April 6, 2015. On April 15, 2015, the court awarded the plaintiff attorney's fees and costs in the amount of $12,293, and the defendants filed an amended appeal. Additional facts shall be set forth as necessary. We now turn to the defendants' claims on appeal.

I

The defendants first claim that the court erred in concluding that they breached their agreement with the plaintiff by entering into "[a] fully executed contract" to purchase the Blackhouse property during the term of the agreement when the contract to purchase the Blackhouse property was illusory, unenforceable, and not a contract as a matter of law. We need not decide this claim because the court found that the defendants breached the agreement on other grounds.

Our review of the defendants' claim requires us to construe the contract. "The standard of review for the issue of contract interpretation is well established. When . . . there is definitive contract language, the

determination of what the parties intended by their contractual commitments is a question of law. . . . Accordingly, our review is plenary. . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Citation omitted; internal quotation marks omitted.) *Giedrimiene* v. *Emmanuel*, 135 Conn. App. 27, 34, 40 A.3d 815 (2012).

Following oral argument in this court, we sua sponte ordered the trial court to articulate its decision.[6] The court issued its articulation on December 16, 2016. The court found that the parties entered into an exclusive buyer representation agreement. Section V (B) of the agreement states that the defendants "represent that [they] have not signed and will not sign any representation authorization or agreements which are in effect during the term of this Authorization with any other broker or brokerage firm for the location, purchase or exchange of residential real estate located in the Towns identified . . . ."

The court also stated that on November 21, 2010, while the agreement was in full force and effect, "the defendants entered into another exclusive buyer representation agreement with another real estate broker," Carey. The defendants never advised Carey that they had entered into the agreement with the plaintiff. If Carey had been made aware of the agreement, he would not have entered into an agreement with the defendants. The court found that, by entering into an agreement with Carey, the defendants breached the provisions of section V (B) of the agreement.

The court further found that section I (A) of the agreement provided that the defendants had appointed the plaintiff to be their "exclusive real estate Broker to represent [them] and assist [them] in locating and purchasing or exchang[ing] real property acceptable to [them] . . . ." The defendants also agreed that, during the term of the agreement, they would "work exclusively through [the plaintiff] in locating and purchasing or exchanging the Property." Section IV (A) of the agreement provided that the defendants "will tell [the plaintiff] about all past and current contacts with any real property or any other real estate agents and refer all leads or information about the Property" to the plaintiff. The court found that the defendants breached the provisions of sections I (A) and IV (A) of the agreement when they knowingly entered into the agreement with Carey while the agreement with the plaintiff was in effect.

Pursuant to Carey's testimony, the court found that the defendants utilized his agency to view properties that they had determined would meet their needs. On January 5, 2011, with Carey acting as their agent, the defendants submitted an offer to purchase the Blackhouse property. On January 21, 2011, the defendants executed a contract to purchase the Blackhouse property with Carey acting as their exclusive agent. At no time did the defendants contact the plaintiff to express their interest in the Blackhouse property, and at no time did they use the plaintiff as their broker to purchase that property. Takacs had sent e-mail messages to the defendants on more than one occasion to remind them that the agreement had not been cancelled and that, if the defendants wished to purchase a house, they had to use the plaintiff as their agent. The defendants proceeded to work with Carey despite those reminders.

The court found that, when the defendants failed to use the plaintiff as their exclusive real estate broker, and, when during the term of the agreement, the defendants did not work exclusively through the plaintiff in locating and purchasing the Blackhouse property, the defendants breached the provisions of section I (A) of the agreement. The court found that when the defendants did not "refer all leads or information" about the Blackhouse property to the plaintiff, they breached the provisions of section IV (A) of the agreement.

The court also articulated on "which of the defendants' actions found to constitute breach of the agreement" it awarded damages to the plaintiff. The court found that the defendants entered into an agreement with Carey while the agreement with the plaintiff was in effect, did not inform Carey of the existence of the agreement the defendants had with the plaintiff, and did not inform the plaintiff of their agreement with Carey. The defendants did not use the plaintiff as their exclusive real estate broker to represent them in locating and purchasing the Blackhouse property, nor did they work exclusively through the plaintiff to locate and purchase that property. The defendants did not refer leads or information about the Blackhouse property to the plaintiff.

The court articulated that it awarded damages to the plaintiff pursuant to section VI of the agreement. The agreement required the defendants to pay the plaintiff a fee of 3 percent of the sales price of the real property that they purchased. The court awarded damages to the plaintiff as a result of the defendants' entering into an agreement with Carey during the term of their agreement with the plaintiff. The court also awarded damages as a result of the defendants' negotiating and entering into a binding contract to purchase and ultimately buy the Blackhouse property for $410,000. The closing on the Blackhouse property did not take place until April 12, 2011, which was beyond the termination

date of agreement. Nonetheless, the defendants negotiated and entered into an enforceable contract to purchase that property during the time their agreement with the plaintiff was in effect. The defendants actively participated in the process of identifying prospective properties. They frequently used their access to the plaintiff's resources to identify new properties that came to market that may have met their housing needs. The court specifically rejected the defendants' argument that they were not aware of or did not understand their obligations—including their obligation to purchase a home using the plaintiff as their exclusive real estate agent—under the agreement.

Although the court found that the defendants breached the agreement with plaintiff by entering into an enforceable contract to purchase the Blackhouse property during the time their agreement with the plaintiff was in effect, that was not the only basis for its finding that the defendants breached their agreement with the plaintiff. The court found other ways in which the defendants violated the agreement that led proximately to their finding and eventually purchasing the Blackhouse property. To wit: the court found that the defendants breached the agreement by entering into an exclusive agreement with Carey while the agreement with the plaintiff was still in effect; they did not inform Carey of the existence of their agreement with the plaintiff; they did not use the plaintiff as their exclusive real estate broker to represent them and assist them in locating and purchasing the Blackhouse property; they did not work exclusively through the plaintiff to locate and purchase the Blackhouse property; and they did not refer information about the Blackhouse property to the plaintiff. On appeal, the defendants do not claim that any of the court's findings, other than the enforceability of the contract to purchase the Blackhouse property, are clearly erroneous or that the court's conclusions are not legally correct.

On the basis of our review of the record and the court's articulation, we conclude that the court did not award damages to the plaintiff merely because the defendants entered into a fully executed contract to purchase the Blackhouse property in January, 2011, which was within the term of their agreement with the plaintiff.[7] The court found that the defendants breached numerous provisions of the contract during the term of the contract, but two are particularly significant, namely, they entered into an agreement with Carey and they executed a contract to purchase the Blackhouse property. Consequently, the defendants damaged the plaintiff in that their breach of the agreement led directly and proximately to the plaintiff's loss of a commission. The court properly measured the damages by 3 percent of the purchase price of the Blackhouse property, a commission the plaintiff would have earned if the defendants had continued to work with Takacs,

or another of the plaintiff's agents, as the agreement required them to do. We, therefore, conclude that the court's award of damages was legally correct. The defendants' first claim, therefore, fails.

## II

The defendants' second claim is that the court improperly awarded the plaintiff attorney's fees without holding an evidentiary hearing. We disagree.

The following facts are relevant to our resolution of the defendants' claim. In its memorandum of decision, the court stated that the agreement "permits the plaintiff to recover costs and attorney's fees. The plaintiff shall submit an affidavit setting forth its claim for these expenses." On March 9, 2015, the plaintiff's counsel filed an affidavit seeking $11,984 for attorney's fees and $2602.80 for costs. On March 16, 2015, the court ordered the plaintiff to submit a more detailed accounting of both time spent and costs incurred on or before March 30, 2015. The plaintiff complied with the order by submitting approximately six pages of detailed billing and cost records. On April 6, 2015, the defendants filed an appeal to this court.[8] On March 9, 2015, the plaintiff filed a bill of costs, which the clerk of the court rejected because the present case was on appeal to this court.

On April 15, 2015, the court issued a memorandum of decision regarding attorney's fees. In its memorandum of decision, the court summarized the nature of the case and its judgment in favor of the plaintiff. It stated: "A trial before the court commenced on July 15, 2014, and ended on October 17, 2014. Although there were five days of evidence, only two days were full trial days." The court found that the plaintiff submitted an affidavit of fees and expenses and, thereafter, on March 30, 2015, submitted time and billing records detailing the requested attorney's fees and expenses. The plaintiff was seeking attorney's fees in the amount of $11,984 and costs of $2602.80. The court cited the legal basis for the award of attorney's fees in a case such as the present one. "[A] contract clause providing for reimbursement of 'incurred' fees permits recovery upon the presentation of an attorney's bill, so long as that bill is not unreasonable upon its face and has not been shown to be unreasonable by countervailing evidence or by the exercise of the trier's own expert judgment." *Storm Associates*, *Inc.* v. *Baumgold*, 186 Conn. 237, 246, 440 A.2d 306 (1982).

The court found that the invoice submitted by the plaintiff was not unreasonable on its face. Plaintiff's trial counsel billed at the rate of $125 per hour for out-of-court time and $200 per hour for in-court time. The court found the rate to be reasonable and that the number of hours billed reflected the fact that the trial occurred over five separate trial days or parts thereof. *Significantly*, the court found that the defendants did

not file any objection with respect to the plaintiff's filings as to attorney's fees and costs. The court found the request for attorney's fees to be reasonable and awarded the plaintiff the sum of $11,984.

As to costs, the court found that the plaintiff had submitted an invoice in the amount of $2602.80, but that the majority of the expenses were for the acquisition of transcripts of the court proceedings. The court did not request a transcript be submitted posttrial. The court, therefore, awarded costs of $309 relating to marshal service fees. The total fees and costs awarded by the court was $12,293.

On April 24, 2015, the defendants filed a motion to reargue and for reconsideration of the court's award of attorney's fees. The defendants claimed that the contract on which the court relied to award attorney's fees is illusory and failed to comply with General Statutes § 20-325a (b); in the alternative, if the contract on which the court relied to award attorney's fees is a legally enforceable agreement, the defendants claimed that the court erred in awarding attorney's fees without first conducting an evidentiary hearing, and the contract is a consumer contract, the present action was not commenced by an attorney who is not a salaried employee of the plaintiff and the amount awarded is in excess of the 15 percent permitted by § 42-150aa (b). The defendants asked the court to vacate its award of attorney's fees. The court did not rule on the defendants' motion to reargue, and the defendants have taken no action to secure a ruling on the motion. On December 23, 2015, the defendants amended their appeal to challenge the court's award of attorney's fees.[9]

We now turn to the standard of review and law pertinent to the awarding of attorney's fees by the trial court. "A trial court's decision to award attorney's fees is reviewable for abuse of discretion. . . . [When determining] reasonableness of requested attorney's fees . . . more than [a] trial court's mere general knowledge is required for an award of attorney's fees. . . . The burden of showing reasonableness rests on the party requesting the fees, and there is an undisputed requirement that the reasonableness of attorney's fees and costs must be proven by an appropriate evidentiary showing. . . . [T]here must be a clearly stated and described factual predicate for the fees sought, apart from the trial court's general knowledge of what constitutes a reasonable fee. . . . That factual predicate must include a statement of the fees requested and a description of services rendered." (Internal quotation marks omitted.) *Gagne* v. *Vaccaro*, 118 Conn. App. 367, 371–72, 984 A.2d 1084 (2009); see also *Commission on Human Rights & Opportunities* v. *Sullivan*, 285 Conn. 208, 237–38, 939 A.2d 541 (2008).

The defendants' claim on appeal is that the court's award of attorney's fees must be reversed because the

court did not hold an evidentiary hearing and provide an opportunity for them to challenge the reasonableness of the plaintiff's request for attorney's fees. Our resolution of the defendants' claim turns on the timeliness of their objection to the plaintiff's request for attorney's fees and costs. See *Smith* v. *Snyder*, 267 Conn. 456, 480–81, 839 A.2d 589 (2004). The court found that the defendants never filed an objection to either of the plaintiff's requests for attorney's fees, that is either the plaintiff's initial affidavit filed on March 9, 2015, or its more detailed request filed on March 30, 2015. The court, therefore, was under no obligation to hold a hearing at which the defendants could litigate fully the reasonableness of the attorney's fees sought. See id., 479–80 n.14.

It is an "undisputed requirement that the reasonableness of attorney's fees and costs must be proved by an appropriate evidentiary showing." (Internal quotation marks omitted.) *Barco Auto Leasing Corp.* v. *House*, 202 Conn. 106, 121, 520 A.2d 162 (1987). Our Supreme Court has noted that "courts have a general knowledge of what would be reasonable compensation for services which are *fairly stated and described* . . . and that [c]ourts may rely on their general knowledge of what has occurred at the proceedings before them to supply evidence in support of an award of attorney's fees." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Smith* v. *Snyder*, supra, 267 Conn. 471. "Even though a court may employ its own general knowledge in assessing the reasonableness of a claim for attorney's fees, we also have emphasized that no award for an attorney's fee may be made when the evidence is insufficient." (Internal quotation marks omitted.) Id., 472. A party need not, however, present expert testimony regarding attorney's fees. Id., 473. A trial court properly may rely on a financial affidavit as well as its own general knowledge and involvement with the trial to ascertain a reasonable attorney's fee. Id., 474.

In *Shapero* v. *Mercede*, 262 Conn. 1, 10, 808 A.2d 666 (2002), our Supreme Court concluded that the court's "general knowledge [of what constitutes a reasonable attorney's fee] and the referee's *unchallenged* findings relevant to the value of the plaintiff's services provided sufficient support for the challenged finding that $275 per hour was an appropriate measure of the value of those services." (Emphasis added; internal quotation marks omitted.)

"[O]ur case law demonstrates, to support an award of attorney's fees, there must be a clearly stated and described factual predicate for the fees sought, apart from the trial court's general knowledge of what constitutes a reasonable fee." *Smith* v. *Snyder*, supra, 267 Conn. 477. "[A] threshold evidentiary showing is a prerequisite to an award of attorney's fees." Id. "[W]hen a court is presented with a claim for attorney's fees, the

proponent must present to the court at the time of trial or, in the case of a default judgment, at the hearing in damages, a statement of the fees requested and a description of the services rendered. Such a rule leaves no doubt about the burden on the party claiming attorney's fees and affords the opposing party an opportunity to challenge the amount requested at the appropriate time." (Footnote omitted.) Id., 479.

Our review of the plaintiff's March 30, 2015 filing of time records and description of services rendered indicates that the plaintiff met its burden of providing a factual predicate upon which the court could determine an award of attorney's fees. The defendants did not object to the plaintiff's initial affidavit for attorney's fees or its subsequent filing in response to the court's order for more information, thereby triggering a hearing to litigate the reasonableness of the attorney's fees requested. This situation is similar to that in *Smith* v. *Snyder*, supra, 267 Conn. 480. In *Smith*, our Supreme Court affirmed the trial court's award of $20,000 in attorney's fees "because the defendants did not oppose or otherwise take any action in response to the plaintiffs' request for $25,000 in fees in their post-damages hearing brief. Although the proponent bears the burden of furnishing evidence of attorney's fees at the appropriate time, once the plaintiff in this case did make such a request, the defendants should have objected or at least responded to that request. Had the defendants demonstrated any interest in objecting to the plaintiffs' request for attorney's fees, the trial court would have been obligated to grant the defendants an opportunity to be heard." (Footnote omitted.) Id., 480–81. Our Supreme Court affirmed the award of attorney's fees in *Smith* "in light of the defendants' failure, prior to this appeal, to interpose *any objection whatsoever* to the plaintiffs' request for attorney's fees. In other words, the defendants, in failing to object to the plaintiff's request for attorney's fees, effectively acquiesced in that request, and, consequently, they now will not be heard to complain about that request." (Emphasis in original.) Id., 481.

In the present case, the plaintiff submitted an affidavit requesting costs and attorney's fees on March 9, 2015. In response to the affidavit, the court ordered the plaintiff to submit a more detailed affidavit by March 30, 2015. The plaintiff filled a more detailed affidavit as ordered by the court. On April 6, 2015, the defendants filed an appeal. Thereafter, the court issued a memorandum of decision on April 15, 2015. The defendants never objected to the plaintiff's request for attorney's fees until they filed a motion to reargue and for reconsideration after the court had ruled on the plaintiff's detailed time records. Despite the fact that the defendants filed an appeal on April 6, 2015, they did not amend their appeal to challenge the attorney's fees awarded until December 23, 2015. Because the defendants failed to

timely object to the award of attorney's fees that would have triggered their right to litigate the reasonableness of the fees requested, we conclude that the court did not abuse its discretion in awarding the plaintiff attorney's fees without holding an evidentiary hearing.[10]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The plaintiff's complaint sounds in three counts: breach of contract, fraud and misrepresentation, and breach of the implied covenant of good faith and fair dealing. The defendants also alleged two counterclaims: breach of contract and breach of the covenant of good faith and fair dealing.

[2] The defendants asserted the following special defenses: anticipatory breach of the agreement, mutual rescission of the agreement and that the agreement fails to comply with General Statutes § 20-325a.

[3] In count one of their counterclaim, the defendants alleged that the plaintiff was responsible for their inability to get a mortgage for 77 Russ Road in Trumbull, which caused them to suffer money damages. In count two of their counterclaim, the defendants alleged that the plaintiff's conduct was wilfull, wanton, and malicious and, therefore, breached the covenant of good faith and fair dealing of the agreement.

[4] The court did not award an administrative fee, which was a contingent fee. No evidence was presented as to how the defendants financed the purchase of the Blackhouse property.

[5] The court also addressed the defendants' special defenses. In their first special defense, the defendants alleged that the agreement was not enforceable pursuant to General Statutes § 20-325a (b), which by its express language prohibits the bringing of an action to recover a real estate commission unless services were performed pursuant to a written contract. See *Thornton Real Estate, Inc.* v. *Lobdell*, 184 Conn. 228, 230, 439 A.2d 946 (1981) (statute has been strictly construed). At trial, the defendants claimed that the agreement is void because it fails to "show the date [on which such] contract was entered into or such authorization given" as provided by § 20-325a (b) (3). (Internal quotation marks omitted.) The court found it undisputed, pursuant to the testimony of Iowna Zajaczkowski and the type written text of the agreement, that the defendants and Takacs signed the agreement on March 29, 2011.

In their second special defense, the defendants alleged that the plaintiff anticipatorily breached the agreement. "Anticipatory breach of contract occurs when a party communicates a definite and unequivocal manifestation of intent not to render the promised performance at the contractually agreed upon time." *Koski* v. *Eyles*, 37 Conn. Supp. 861, 862, 440 A.2d 317 (1981). The court found that there was a breakdown in the relationship between Takacs and the defendants, but that Takacs made clear that there were other agents of the plaintiff who were willing to work with the defendants to locate a suitable property. The evidence established that the plaintiff did not engage in conduct constituting an anticipatory breach of the agreement.

The court further found that the evidence did not support the defendants' third special defense of mutual rescission. "A definite election to rescind a contract is final and operates as a waiver of any claim for damages for breach of the contract. A rescission is effective when, in addition to a restoration of status quo, an intention on the part of both parties that the contract be rescinded exists." *Gordon* v. *Indusco Management Corp.*, 164 Conn. 262, 266, 320 A.2d 811 (1973). Myers was clear and unequivocal that the plaintiff never agreed to rescind the contract. Moreover, Takacs explicitly informed Peter Zajaczkowski that the plaintiff did not consent to a rescission.

The defendants raised a fourth defense for the first time in their posttrial brief, in which they claimed that the agreement was unenforceable because it is a contract of adhesion and contains terms that are unreasonable and unconscionable. The court found, as a matter of law, that the fourth special defense was not properly before the court as it had not been specially alleged. See Practice Book § 10-50. If the defendants had intended to rely on this theory, they were required to plead it initially or seek to amend their existing special defenses.

[6] We sua sponte ordered the trial court, pursuant to Practice Book § 60-5, "to articulate which of the defendants' actions constituted a breach of the agreement they entered into with the plaintiff. Also, the court is ordered to articulate upon which of the defendants' actions found to constitute breach of the agreement between the [plaintiff] and the defendants did the

court award damages to the plaintiff. The trial court shall file a written articulation of its decision with the Appellate Court Clerk [within thirty days of issuance of notice of this order]."

[7] Because we conclude that there were factual and legal bases on which the court properly found that the defendants breached the agreement and awarded the plaintiff damages, we need not decide whether the contract to purchase the Blackhouse property was illusory, unenforceable, and not a contract as a matter of law, as the defendants claim.

[8] See *Hylton* v. *Gunter*, 313 Conn. 472, 479, 97 A.3d 970 (2014) (judgment is final for purposes of appeal when trial court has awarded, but not yet determined amount of, attorney's fees); *Paranteau* v. *DeVita*, 208 Conn. 515, 523, 544 A.2d 634 (1988) (judgment for purposes of appeal final even though amount of attorney's fees to be determined).

[9] Practice Book § 61-9 provides in relevant part: "Should the trial court, subsequent to the filing of a pending appeal, make a decision that the appellant desires to have reviewed, the appellant shall file an amended appeal within twenty days from the issuance of notice of the decision as provided for in Section 63-1." The plaintiff did not object to the untimely filing of the defendants' amended appeal.

[10] The defendants also claim that the amount of the court's award of attorney's fees was improper pursuant to § 42-150aa. The defendants also failed to timely raise this claim in the trial court, and we decline to review it on appeal.